UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY ROY WILSON,<br>Petitioner,<br>v.<br>JEFF LYNCH,<br>Respondent. | Case No. 22-cv-06042-PCP<br><br>**ORDER DENYING HABEAS PETITION** |

Anthony Wilson petitions for a writ of habeas corpus on the ground that his continued confinement pursuant to a state criminal conviction violates federal law. For the reasons that follow, the Court denies Wilson's petition.

## BACKGROUND

In February 2019, Wilson and two other men, Aoderi Samad and Tyrone Terrell, were convicted by a jury in Alameda County Superior Court of murdering Anthony Stevens. The jury also convicted Wilson for unlawfully possessing a firearm as a felon and attached firearm enhancements to the murder charge.

The relevant facts relating to the murder are as follows: Wilson and several other men approached Stevens while he was resting in his car in Oakland, purportedly to ask him a question. Stevens was alarmed and stepped out of his car. He had a gun in his right hand. Wilson then shot at Stevens, which he claimed was done in self-defense after Stevens had pointed his gun at the group. At trial, Wilson demonstrated the action of Stevens purportedly raising a gun as he got out of the car. Wilson testified that "he just kept shooting [at Stevens] out of fear." Dkt. No. 1, at 10. Three other men (Samad, Terrell, and Derick McFadden) also shot at Stevens, who eventually died.

A man named Kermit Tanner was also present with Wilson at the scene but did not shoot at Stevens. Tanner was tried separately from the others. Tanner allegedly told prosecutors that he had mentioned to Wilson just before the shooting that the "dude has a hammer," meaning "Stevens has a gun."

The following background on Wilson's trial is taken from the California Court of Appeal opinion, Dkt. No. 8-1, at 14–17:

**1. Wilson's Testimony**

While the prosecutor was cross-examining Wilson about his account of the shooting incident, Wilson confirmed his prior testimony that he yelled the word "Gun" when he saw a gun in Stevens's hand. After Wilson acknowledged that his face could be seen in the video footage of Stevens getting out of the car, the prosecutor asked whether "we should be able to see your lips moving," but the trial court sustained an objection that this question called for speculation. Then, the following exchange occurred:

[Prosecutor]: Q. Isn't it true, Mr. Wilson, that you never yelled, "Gun"?
A. I did. I probably didn't yell it loud, but I actually said, "Gun actually."
Q. Isn't it true that you already knew he had a gun?
A. I did not.
Q. Isn't it true that Kermit Tanner had already told you all, "Dude has a hammer"?
A. He never said that.
Q. Isn't that why you were afraid for Kermit Tanner to actually come and testify?
A. No.

After this colloquy, the prosecutor produced a compact disc and transcript, which were marked for identification as People's 48 and 48-A. As copies of the transcript were distributed to the jury, Wilson's counsel requested permission to approach the bench, which led to an off-the-record discussion in chambers. When the court went back on the record, it excused the jury in order to discuss defense objections to the exhibits proffered by the prosecutor.

**2. Exhibits 48 and 48-A**

Exhibit 48 contained recordings of five telephone conversations that Wilson had with people while he was in jail, and exhibit 48-A was a transcript of the phone calls. The prosecutor wanted to question Wilson about each call and play parts of them for the jury. The court considered each call separately, hearing arguments for and against admissibility.

[The trial court excluded the first call identifying Samad as a participant in the shooting as cumulative of other evidence establishing the identity of the participants in the crime].

2

The second and third calls were conversations Wilson had in October 2017, each with a male who shared his last name. During both calls, the men talked about the fact that Kermit Tanner had separated his case and expressed concern about what Tanner was doing. The prosecutor argued these calls were relevant to prove Wilson was afraid Tanner might testify against him. Wilson objected that admitting evidence of this collateral matter would be unduly time consuming. It would require Wilson to explain that he had an initial concern about what Tanner would say, but that concern was dispelled after he saw Tanner's statement to the police, which was favorable to him because Tanner told the police that there was never a plan to attack Stevens. The prosecutor responded that other parts of Tanner's statement could harm Wilson because Tanner had told the police that, although he was armed, he did not shoot at Stevens. And Tanner also told police that he informed his friends that the "Dude" (Stevens) had a "hammer."

The court stated that Tanner's statement sounded relevant and opined that he could be called as a witness. At that point, Terrell objected that the prosecutor had already asked a question of Wilson that assumed Tanner's statement about the dude having a hammer was true. The question was improper, Terrell argued, because Tanner had made a deal that did not require him to testify and the defendants had been led to believe that Tanner was not going to testify. Without Tanner's testimony, the prosecutor's question was hearsay and highly prejudicial, Terrell's counsel argued. McFadden's counsel concurred, adding that his client's right to confrontation had been violated since Tanner could not be compelled to testify.

The prosecutor acknowledged she did not plan to call Tanner as a witness but argued that Wilson's fear of Tanner's testimony was relevant because Tanner was the only defendant who did not shoot his gun. The court rejected this theory, finding the probative value of the second and third phone calls was outweighed by other concerns, and instructing the prosecutor to stay away from "[t]he idea of [Tanner] testifying or not testifying." Terrell objected that the damage had already been done because the prosecutor's questions on the subject were improper. The other defendants agreed and made a joint request for a mistrial. The court stated that an admonition would cure any potential harm but agreed to interview the jurors about the matter.

The court found the final two phone calls contained admissible evidence, and evidentiary rulings regarding these two calls are not challenged on appeal.

**3. Jury Interviews**

After the court ruled on the admissibility of the phone calls, it interviewed each juror about whether he or she had reviewed the prosecutor's transcript while the court and counsel had their in-chambers conference.

Four of the twelve seated jurors reported that they did not acquire or retain any substantive information from their cursory review of the transcript. Five jurors remembered something about the first phone call …, but did not recall reading anything beyond that call. Three jurors recalled that the transcript contained information about Kermit Tanner.

3

Juror 2 reviewed four pages of the transcript, and recalled that this portion covered two phone calls by Wilson. In the first call, Wilson said he knew why Aoderi was mad at him and in the second call there was a reference to the fact that Tanner split from the defense. Juror 2 stated that he or she could disregard this information if instructed to do so.

Juror 6 skimmed through the document and read about half of it. A reference to Kermit Tanner caught this juror's attention. Juror 6 could not remember specifics but thought the people were talking about whether or not Tanner had shared information with the authorities.

Juror 11 skimmed a couple of pages of the document and recalled it was a general conversation about how the caller was "holding up." When questioned further, Juror 11 recalled that there was a comment about Tanner not being a part of the case and a rumor that he was separating from the trial. Juror 11 did not draw any conclusion from this remark other than that it confirmed what he or she saw in the video, which was that people other than the four defendants were involved in the incident.

### 4. Denial of Joint Defense Motion for a Mistrial

After thorough discussion of the matter with the parties and counsel, the trial court denied the defendants' joint motion for a mistrial. The court divided the matter into two distinct issues. The first pertained to the questions that the prosecutor asked Wilson about Tanner. The court found that the prosecutor had a good faith basis for her questions and any prejudice associated with them could be cured by an admonition. The second issue pertained to distribution of the transcripts, which contained some evidence that was deemed inadmissible. The court found again that any prejudice could be cured by an admonition. Accordingly, when trial reconvened, the court gave the jury the following admonitions:

> We're ready to proceed with continued cross-examination. But before we do that, there are a couple things I need to say to you, ladies and gentlemen, with respect to last week's proceedings. I'm going to admonish you now to disregard a few things.
>
> And I think if you recall, I may have mentioned when I read some of the preliminary instructions—which was a while ago, you may not remember specifically—but there are occasions during most trials where, as the judge, I will instruct the jury to disregard certain things. So what I'm going to do now is admonish you with regard to two questions that were asked the last time we were in session, the very last session that we had.
>
> There were two questions asked when Mr. Wilson was testifying by the prosecutor. One had to do with whether or not he was asked a question or a comment was made to him to the effect that "someone had a hammer" or "dude had a hammer." And there was a second question that was asked about whether there was a concern on Mr. Wilson's part about Mr. Tanner testifying.

> I'm going to—I am now, I'm going to admonish you to completely disregard those questions and answers. Not consider them for any purpose. They are not evidence. They will not be in evidence. And they're not to enter into your deliberations or be considered for any purpose at all. Okay?
>
> The second thing, it has to do with the transcripts that you were handed temporarily. When we were last in session, as you might recall, I had a little colloquy with each one of you regarding the transcripts.
>
> The transcripts will not be coming into evidence. To the extent that any of you may have looked at or glanced at the transcripts and read the front page, one or two of you may have looked at a page or two beyond that, that's—those are to be completely disregarded as well. They are not going to be part of the record. They are not going to be in evidence. And they're not to be considered by you for any purpose whatsoever. Okay?
>
> So when you deliberate and the evidence that you have before you, which will be continued to be presented today, the questions that I referred to are stricken and are not to be considered for any purpose and the same is true for the transcripts. Okay?

At the end of the trial in July 2019, Wilson was sentenced to a term of 40 years to life. Wilson appealed his conviction, arguing in part that the trial court had erred in failing to declare a mistrial. The California Court of Appeal held that the prosecutor did not commit prejudicial misconduct through her cross-examination or introduction of the phone conversation transcript, and that the motion for a mistrial was properly denied given the trial court's jury admonition. The state appellate court found substantial evidence to support the trial court's factual finding that the prosecutor had a good faith basis to ask Wilson about Tanner's statement. Dkt. No. 8-1, at 18. The appellate court also held that the prosecutor's question did not violate Wilson's constitutional right to confrontation because Tanner's police statement was never entered into evidence. *Id.* at 19.

After his petition for review was denied by the California Supreme Court, Wilson filed this timely habeas petition on October 13, 2022. He argues that his due process rights were violated because: (1) the prosecutor's use of facts not in evidence (via questioning in cross-examination and through the phone conversation transcript) was misconduct under federal and California law; (2) the use of Tanner's statement during cross-examination violated his rights under the Sixth Amendment's Confrontation Clause; and (3) the state court's denial of the motion for mistrial was based upon an unreasonable application of the facts to his case.

5

**STANDARD OF REVIEW**

If a claim has been adjudicated on the merits in state court, a federal habeas court may not grant relief to a person in custody pursuant to a state court judgment unless the state court's adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). "[F]or a state court's decision to be an unreasonable application of [the Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

**ANALYSIS**

**I.   The State Court Did Not Unreasonably Apply Clearly Established Federal Law in Finding No Prosecutorial Misconduct.**

"[A] prosecutor commits misconduct when he or she attempts to create an impression on the jury by innuendos in questions when no supporting evidence exists." *United States v. Sewell*, 359 F.App'x 860, 861 (9th Cir. 2009). In determining whether prosecutorial conduct provides a constitutional basis for invalidating a conviction, the "relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The question before the Court is whether the state court's finding that no such due process violation occurred constituted an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

The government argues that the prosecutor's cross-examination question was not improper because she had a "good faith belief that Tanner told his codefendants that Stevens had a gun." Dkt. No. 8-1, at 31. While the government acknowledges that "the prosecutor did not intend to call Tanner as a witness" when the question was asked, in the government's view the prosecutor "reasonably could have expected that a more specific reference to Tanner's hammer statement

6

would refresh petitioner's recollection." *Id.* at 31.

The Court need not address this issue, however, because even if the prosecutor committed misconduct by asking Wilson about Tanner's statement during cross-examination and presenting the phone conversation transcript despite knowing that Tanner could not testify, these actions did not infect the trial to a degree sufficient to render the state court's holding an unreasonable application of clearly established law for the purposes of § 2254(d)(1). As the government notes, the state trial court explicitly admonished the jury about both the cross-examination question and the phone conversation transcript, limiting any prejudice that might have resulted. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that habeas relief is not warranted where the state's trial error "did not have a substantial and injurious effect or influence in determining the jury's verdict."). It is generally presumed that a jury follows such instructions from the judge, and there is no evidence to the contrary here. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Further, as the state appellate court held, the "crux of Wilson's defense was that he shot at Stevens *after* Stevens pointed his own gun"—a defense that "did not hinge on whether Wilson knew Stevens had a gun before he approached the car." Dkt. No. 8-1, at 20. As the government notes, this particular defense was inconsistent with video evidence demonstrating that Stevens never raised his gun. *Id.* at 36. Given that Wilson's chosen defense did not depend upon whether or not he was aware of Stevens's gun in advance and was contrary to the video evidence before the jury, the state court did not unreasonably apply clearly established federal law in finding no due process violation based on the prosecutor's question about Tanner's "hammer" statement.

**II.    The State Court Did Not Unreasonably Apply Clearly Established Federal Law in Finding No Confrontation Clause Violation.**

Permitting testimonial hearsay at a criminal trial violates the Sixth Amendment's Confrontation Clause unless the declarant is unavailable to testify and there was a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36 (2004). Wilson argues that the prosecutor's introduction of Tanner's statement "dude has a hammer" violated his constitutional right to confrontation because he did not have an opportunity to cross-examine Tanner. Dkt. No. 1, at 29. The government responds that the statement is not hearsay because it

was introduced to show its effect on the listener rather than for the truth of the matter (i.e., to show that Wilson knew in advance that Stevens might have a gun, not to prove that Stevens actually had a gun). The government further argues that Tanner's statement to Wilson is not testimonial because it was not made in the course of a police interrogation with the primary purpose of proving past events potentially relevant to a later criminal prosecution. *Davis v. Washington*, 547 U.S. 813 (2006).

The state court did not unreasonably apply clearly established federal law in finding no Confrontation Clause violation. While Tanner's statement to the police about what he said to Wilson was undoubtedly testimonial, the prosecutor did not ask Wilson about Tanner's *police* statement but only about whether Tanner had made a statement *to Wilson* before the shooting. *See* Dkt. No. 18-1, at 19 (state court of appeal decision noting this distinction). The latter statement was not testimonial because it was said to Wilson before the murder, not to the police as part of an investigation. Further, the prosecutor asked about the statement to show its effect on Wilson as a listener rather than for its truth regarding whether Stevens had a gun (which was undisputed and established through other evidence). The statement thus served a nonhearsay purpose. *See People v. Ramirez*, 13 Cal.5th 997, 1115 (Cal. 2022) ("Evidence of an out-of-court statement may be admitted for the nonhearsay purpose of showing its effect on the listener so long as that effect is relevant to an issue in dispute."). For both reasons, the state court's determination that Wilson's Confrontation Clause rights were not violated was not unreasonable.

### III. The State Court Did Not Make an Unreasonable Factual Determination in Denying Wilson's Motion for a Mistrial.

Wilson finally argues that, in denying his motion for a mistrial, the state trial court unreasonably found that the court's admonition offered adequate protection against the risk that the jury would draw impermissible inferences from the prosecutor's question concerning Tanner. Dkt. No. 1, at 31. According to Wilson, the video that was shown by the prosecutor to jurors at the end of the trial, which portrayed Tanner speaking to another member of the group after looking into Stevens's car, created a "slight risk" (as acknowledged by the trial court) that the jury was reminded of Tanner's "dude has a hammer" statement notwithstanding the court's admonition.

Dkt. No. 8-1, at 30. Wilson further contends that the six-day delay between the juror questioning and the court's admonition negated the effectiveness of the admonition. Dkt. No. 1, at 33.

As Wilson concedes, however, the prosecutor never mentioned anything about Tanner when displaying this video to the jury at the conclusion of Wilson's trial. *Id.* at 32. The government thus argues that showing the jury the video did not negate the trial court's curative admonition. Dkt. No. 8-1, at 40. The Court agrees. Whether or not there was any trial court error in allowing the prosecutor to display this video to the jury, the prosecutor did not refer to Tanner or his "hammer" statement when presenting the video, so the trial court's factual determination that the jury admonition would not be negated by displaying this video was not so unreasonable as to warrant relief by a federal habeas court. The Court also agrees with the government that the delay between the juror questioning and admonition did not negate the effectiveness of the court's admonition, but rather demonstrated the trial court's thoroughness in addressing Wilson's challenge to the prosecutor's question about Tanner's statement. *Id*. at 41. Only after carefully questioning each juror and extended argument by the parties on the admissibility of the prosecutor's cross-examination question and introduction of the phone conversation transcript did the trial court come to the reasonable factual determination that a jury admonition would cure any possible prejudice injected into the trial by the prosecutor's conduct.

## CONCLUSION

For the foregoing reasons, the Court denies Wilson's petition for a writ of habeas corpus.

**IT IS SO ORDERED.**

Dated: April 8, 2024

_____
P. Casey Pitts
United States District Judge